# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY,

### FEBRUARY TERM, 1866.

---

## CATHARINE V. B. ADAMS *vs.* ALONZO W. ADAMS.

1. *Query.* Whether desertion would be a valid plea to a bill for divorce on the ground of adultery. But, admitting that it would, it is necessary that such desertion should exist for the uninterrupted period of three years.

2. Witnesses of questionable character are to be relied on, in any judicial proceeding, only so far as their testimony is intrinsically probable, or is corroborated by circumstances.

3. Where, upon a bill for divorce on the ground of adultery, the direct evidence, though insufficient of itself to support the charge, is sustained by the proved habits and character of the accused, as well as the strong probability of corroborative facts, the complainant is entitled to a decree.

---

*Mr. Isaac W. Scudder* and *Mr. Zabriskie,* for petitioner.

*Mr. C. Parker* and *Mr. Bradley,* for defendant.

BEASLEY, C. J., sitting as Master.

This is a suit brought by a wife against her husband for a divorce, on the ground of adultery. The facts stated in

the petition are, in substance, to the effect following, viz.
that the parties were married on the 27th of May, 1854;
that they resided with the mother of the wife, in Jersey City,
until March, 1855, when they removed to New York, and
remained there until February, 1861, when, it is alleged, the
husband failing to provide a sufficient support for the wife,
she was compelled to leave him and return to the parental
house, where, with her only child, she has been supported
by her mother ever since; that the defendant, in August,
1861, joined the army of the United States, and went to the
seat of war, and was, till the commencement of this suit, en-
gaged in active service, having no house, home, or fixed
place of residence. Then follow articles of crimination, charg-
ing that the defendant, at divers times in the months of
March and April, in the year 1864, in the city of Albany,
committed adultery, in the language of the pleading, "with
divers persons, whose names are unknown to your petitioner;
and also, especially, that he did, on the twenty-second, twenty-
third, and twenty-fifth days of March last aforesaid, commit
adultery in the Delavan House, in the city of Albany, in
room numbered 150 in said house, with a woman whose
name is unknown to your petitioner." There is also a further
specification of other criminal acts, which, as they are not
attempted to be proved, it is not necessary to notice. The
petition concludes by praying for a dissolution of the mar-
riage, and for the custody of a female child, born of this
marriage, who is in the eleventh year of her age. The
answer denies the adultery, and also the fact that the wife
left the defendant on account of his inability or neglect to
maintain her.

The evidence which has been taken is excessively volumi-
nous. A considerable portion of it, however, relates to a
subject which is no longer in controversy, so that it can be
laid aside with a single remark. The petitioner endeavored
to show an adulterous act, on the part of the defendant, in
the state of Maryland. The allegations on the record, taken

in their widest scope, did not embrace this transaction, for the place laid was the city of Albany; nevertheless, the effort was made to prove the defendant's guilt at this distant theatre. The attempt proved abortive, but I cannot think that the significance of this portion of the case altogether ceases with its rejection on the ground of its falsity. The narration of the witness on this part of the case, who was introduced in behalf of the petitioner, was clear, circumstantial, and complete; if her testimony could not have been overcome, the defendant must have been pronounced guilty. But it has been clearly shown that the character of the witness was bad, and there is every reason to believe that many of the most important circumstances stated by her are unreal. I think that the refutation of her story should be regarded as complete; and, therefore, with this conviction, I passed from its further consideration at an early stage in my examination of the proofs. But the remark which I have to make upon this subject is, that, although I easily dismissed this evidence as unworthy of credit, a certain impression, which its presence in the cause created, remained on my mind. I felt this witness had deceived the petitioner and her counsel, and it was impossible to avoid the unpleasant suggestion that there might be others, in a case like this, who might go a step further and mislead the court. I have not been inattentive to the admonition of this circumstance, but have been conscious of a bias against the other parts of the case set up by the petitioner, and if such parts have not been regarded with suspicion, they have, at least, been subjected to the severest scrutiny.

There is also another feature in the mode in which the evidence has been presented, which cannot be passed without notice. It is this. Much of the evidence taken on behalf of the defendant, has been introduced without any regard to the rules regulating the examination of witnesses. As a matter of mere form, I might, inasmuch as it appears that the defendant, for the greater part, acted for himself in the absence of his counsel, be content to overlook, in silence, this

Adams *v.* Adams.

departure from correct practice.  But the error so often occurs, and exhibits itself in so gross a form, that it in fact amounts, not merely to the non-observance of a formula, but to a serious impediment to a just estimation, in many particulars, of the value of the testimony.  Numerous instances have been observed, in which questions have been propounded in so direct and suggestive a form as entirely to deprive the answers, with regard to many important points, of all reliable effect.  In some cases, I have even doubted whether entire depositions should not be suppressed; and although I concluded to retain them, it was with no intention of relying on them as independent proof, but only so far as they appeared to be sustained by other testimony.  To regard them beyond this point, I should esteem an act of injustice to the petitioner.

There are some general aspects of the case to which my attention has been directed, which it is proper that I should dispose of before proceeding to a consideration of its merits.

The first and most important of these is the objection taken on the argument, that the petitioner is not entitled on the present occasion, to a standing in this court, on the ground that she, herself, was, at the time she commenced this suit, guilty of a violation of the matrimonial contract, by her desertion of her husband.  It was insisted that the husband can set up this dereliction of duty by way of recrimination, and that it is a full defence to the present action.

The law upon this subject is perplexed.  There can be no doubt, that the adultery of a complainant can be pleaded as a bar to a suit for a divorce grounded on the same offence. Thus far the authorities, English and American, are agreed. The diversity begins in the consideration of the particular, whether the proof of an offence of a lesser moral grade will have the same effect.  In the English ecclesiastical courts, at least in modern times, it appears to be settled that cruelty cannot be pleaded in bar to a charge of adultery.  *Harris* v. *Harris,* 2 *Hagg. Eccles. R.* 376; *Cocksedge* v. *Cocksedge,* 1 *Robertson* 90; *Chettle* v. *Chettle,* 3 *Phill. Eccles. R.* 507.

There can be no doubt, that desertion would, before these courts, be put upon the same footing. But there is an American case impeaching this doctrine, and Mr. Bishop appears to consider the question an open one in this country, on the ground that there existed, at the time of the Revolution, no authority ruling the point, and that it is not entirely consistent with analogous principles in the law. *Nagel* v. *Nagel,* 12 *Missouri* 53; *Bishop on M. & D.*, § 396, 403.

It certainly seems somewhat unreasonable to discriminate between offences which the statute, so far as touches the rights of the parties, springing out of the matrimonial contract, has put upon the same level. Adultery, desertion, and cruelty have, by the law of this state, the same consequence attached to them; that is, either of them affords a cause for divorce, and why the one should not be sufficient as a recriminatory plea to a charge of either of the others, is not very readily perceived. But it is not, in the present case, at all necessary to decide this question, for there can be no pretence that the statutory offence of desertion has been committed in the present instance. For, admitting that desertion is a good plea to a charge of adultery, there seems to be no ground to doubt that such desertion must exist for the statutory period of three years before it can be so used. Until this occurs, no legal offence can have been committed. It would hardly be pretended that the wilful desertion by a husband, for a week, or a month, would enable his wife to commit adultery with impunity, so far as concerned the matrimonial connection. And yet this is the principle upon which this defendant must stand, if his recrimination is to prevail, for the separation between himself and his wife did not continuously endure for the period which would constitute just ground for a divorce. The pleadings admit that the complainant commenced to live with her mother, apart from her husband, in the month of February, 1861, and that in the following winter she cohabited with him for a short period of time, in the city of Washington. The petition, in this cause, was filed on the 6th May, 1864. If, consequently,

Adams *v.* Adams.

the separation between the husband and wife, in this case, was of a character to constitute desertion within the intent of the statute, it was not of sufficient continuance to form a ground of divorce on the application of the husband, and for the like reason, cannot be interposed as an adequate answer, by way of recrimination to this proceeding. But in point of fact, I have not perceived any evidence before me, from which an inference could, with any degree of propriety, be drawn, that the wife, in the present case, when she last parted from her husband, left him against his consent. The petition states that she went to her mother's, because the defendant did not provide for her a sufficient support. The answer denies this statement, and imputes the absence of the wife to the instigation of her mother. But the answer does not set up such absence as a wilful and continued desertion; it has, neither in form, nor substance, the semblance of a recriminatory plea. But even if it presented this aspect, it would not have been evidence in the cause, and as there is no evidence which elucidates the point, there is no warrant to convert the separation, which, it is admitted, existed, into a desertion, of which there is no proof. The defendant, himself, has proved, that about a year after this separation commenced, his wife voluntarily left her mother's house, and came to him in Washington, where they cohabited for several days, and until his military duties called him to the field, when they parted with regret. It is clear that, when they thus separated, the husband knew his wife would return to her mother's, and yet he made no objection, and did not express a wish, so far as appears in the case, that she should live elsewhere. From that time to the filing of the petition in this cause, there is nothing in the evidence to induce a belief that the defendant ever, on any occasion, expressed the desire that his wife should leave a home to which she had gone, certainly with his acquiescence, if not consent. It is obvious that such a state of circumstances does not present any of the legal characteristics of a desertion. I conclude that there is nothing in this point.

2 E*

The next general topic alluded to by counsel, and on which much stress was laid, was the allegation that this suit had not originated with the petitioner, but had been promoted, against her wishes and conviction of right, by her mother.

But the case, I think, is destitute of all evidence to sustain this hypothesis. It does, indeed, appear that this lady has at times expressed great abhorrence of the defendant, and has been vehement in her denunciations of his conduct. But in judging of her, in this respect, her position relative to him must be taken into account. In the year 1853, the defendant was introduced into her family. She had then living but one child, the petitioner, who, as the only descendant of a wealthy family, had large expectations. The defendant, immediately upon his introduction, addressed her. A number of his letters, received during the period of this courtship, are among the proofs. They are addressed to the petitioner, or to her family, and they purport to come from different places in the south. They describe the journeyings and adventures of the writer; he is at one time exposed to the cholera; a traveling companion in the same vessel dies, and is hurriedly buried in a "desert place" on the shore of the Mississippi; the defendant has made his last will, leaving his entire estate to the petitioner, "excepting only ten thousand dollars," which has been given to a nephew then at college in Tennessee; he is then hurrying away to New Orleans to save a large amount of gold dust, on deposit at a banking-house, which he has been credibly informed would fail within a few weeks. It is not necessary to dwell longer on these details. He is married to the petitioner. They reside with her mother nearly a year. He expresses his desire to put up a costly dwelling-house as a home for his family, and his mother-in-law, for this purpose, conveys to him a tract of land; this he raises money upon by mortgage. He then with his wife goes to boarding in New York. Some time elapses, and then comes the discovery; the defendant was not a man of property; he had not traveled, as he pretended, from place to place in the south; he was a mere impostor,

and his letters were, from first to last, a deception and false-hood.   But this was not all: it was further ascertained that at the time he had engaged himself to the petitioner, he was the husband of another, and that there was every reason to suppose that when he offered himself in marriage to his present wife, he was on his bridal tour with his first.   He was divorced on the 26th of April, 1854, and on the 27th day of the following month, was married to the petitioner.   It was thus that this defendant stood revealed to this lady, the mother of the petitioner; she could not do otherwise than regard him as a man destitute alike of honor and of truth; as a mere adventurer, who had entrapped her daughter into the degradation of marriage with himself by the use of the lowest arts.

Under these circumstances, she appears to have received information that induced her to believe that the defendant had a wife living in California.   It was not unnatural that she should give easy credence to such an accusation, and ac-cordingly she had the defendant prosecuted for bigamy.   It is at this point she is assailed by the evidence in this case.   The charge is, that she endeavored to suborn two witnesses in this criminal prosecution, both of whom have been ex-amined as witnesses in the present suit.   It is obvious that this crimination has nothing to do with the case now before me, and the whole of the testimony with regard to it should be suppressed.   But as it has been obtruded among the proofs, I will, in passing, remark, that since the hearing I have read it carefully through, and am entirely satisfied that it fails to raise even the slightest suspicion against the per-son it attempts to inculpate, for the evidence adduced in its support is the kind which, of all others, is least likely to make any impression on the mind of a person of experience.   And looking beyond this line of evidence, there is absolutely nothing upon which to rest the accusation which was the principal theme of declamation on the argument, that the mother-in-law, and not the petitioner, is the real actor in this case.   It is true that she has not disguised her desire

to see her daughter divorced from the defendant; but this is a feeling which, in view of the preceding narration, can neither elicit suprise, nor provoke censure. Besides this expression of opinion, my memory does not recall any circumstance of the least significance, which connects this lady with the present suit. There is no evidence to justify the conclusion that this suit is the mere creature of her will.

Leaving this topic, I proceed then to consider, as briefly as possible, the merits of the case.

The charge which is relied on, and which it is insisted has been sustained by the evidence, is, that the defendant, on some day in the month of March, in the year 1864, had criminal intercourse, in room number 150, in the Delavan House, in the city of Albany, with a woman by the name of Louisa Butts. In proof of this accusation, this woman, the *particeps criminis*, was examined, and her statement, in its substantial parts, was given in the words following, to wit, "I first met him (Col. Adams) in Albany, in Eagle street, between Pine street and Maiden lane; it was on the twenty-fifth day of March last. I was going along Eagle street, in company with a gentleman, when I met the colonel, and he bowed to me. I looked back, and he waved his handkerchief at me, and crossed over towards me. He asked me if I saw company; I told him I did. He asked me if he could see me; I told him he could. He wanted to know where he could see me; he wanted to know where I was living, and if he could call at my house and see me. I told him I did not receive company at my house; that I was living with my father and mother. He wanted to know if I would meet him that evening; I told him I would. I met him that night, at eight o'clock, at the corner of Eagle and State streets. He asked me if I would go to the Delavan House, and go to the private entrance and inquire for Colonel Adams; that I would see a negro there who would show me his room; that he had fixed it all right with him. I went to the Delavan House, and saw the colored man; inquired for Colonel Adams; he took me to Colonel Adams' room; Colonel

Adams was not there when I first went there. I turned back, and went down stairs, and stood talking to the colored man, and while I was talking to the colored man, the colonel came along, and asked me if I would go up to his room; I told him I had been up, that the room was locked; he said it was all right now. I went up stairs with the colored man, who showed me the room 150. I was in the room a few minutes, and Colonel Adams came in. He asked me to undress and go to bed, which I did. He asked me if I was all right; I told him I was. We went to bed together, and the colonel had connection with me."

In confirmation of this narrative, the colored man referred to by this witness, and who it is alleged, admitted her into the Delavan House, was produced. His name is Levi Johnson, and his story goes to the effect that the defendant, on the evening in question, applied to him to pass the woman through the private entrance of the hotel, of which he was in charge; that he consented, and accordingly introduced her in the manner, and at the time, described by her in her evidence.

This is the direct and principal proof in the case, and of course, if it is to be implicitly relied on, the guilt of the defendant is established. But that such is not the quality of the evidence, is at once apparent. No one can doubt for a moment, that the testimony of both these witnesses must be received with distrust, and weighed with great caution. The female belongs to the lowest grade of prostitutes. Her habits and associations have been for years, offensively low and profligate. Her character for truth has been successfully impeached. Neither does the reputation of the male witness entitle him to the unimpaired confidence of the court. Taken at the best, his character is such as to awaken suspicion. Numerous witnesses have deposed that they would not believe him on oath; many others have expressed a contrary opinion. The truth, I suppose, is, that he has no established reputation either one way or the other, and that like many persons in his condition in life, he is addicted to

the minor vices. By his own admission, he was in 'the constant habit of pimping for whoever made application to his profligacy. Such witnesses, it is clear, are to be relied on in any judicial proceeding, only so far as their testimony is intrinsically probable, or is corroborated by circumstances. I have scrutinized, therefore, with a great deal of care, the deposition of this man, Johnson. I have read and re-read it since the argument, and, although on my guard against it, on each occasion the impression has become strengthened, that it bears within itself many strong indications of truth. If untrue, it is a story devised and narrated with strange skill. Though minute in its details, and though the cross-examination was most elaborate and rigorous, it is entirely consistent, in all essential particulars, with the deposition of the woman, Louisa Butts. It is to be noticed, as a matter of considerable significance, that this witness, Johnson, was present during the examination of this woman, and that, instead of repeating her statements, and confining himself closely to them, which is usually the case when a story is to be told in concert, he enters upon a narration, which, while it sustains her evidence in all material respects, superadds many particulars, which, when examined, appear well calculated to have impressed his mind, and yet which, we can readily suppose, did not arrest her attention, or which might naturally have escaped her memory.

A few examples will serve to explain this observation. Thus, he says, when Louisa Butts came to the private entrance, he asked her if she knew what floor she had to go on, and she said, no; that he told her they had to pass the house-keeper's room; that he instructed her to wait there a few moments while he went to see if the road was clear; that he went up the back way, and found the door locked; that he returned and told her there was a great risk to run, that every one of the servants knew who she was, and if he was caught he would be turned away; that in passing the house-keeper's room she came out and looked, and after pointing out to his companion the chamber of the defendant, and

seeing her enter it, he stole down another way to avoid being questioned; that after Louisa Butts came down they had some conversation, which he narrates; that she went away, and in a short time returned, stating she had left her gloves in defendant's room, and that he, the witness, at her request, went for them and brought them to her. These are some of the details, and I confess it seems to me almost incredible, that this ignorant waiter-boy should have had the marvellous boldness and cunning to annex to the statements of the female witness all these minute particulars, to which she had made no reference. To those who know, from experience and reflection, the laws which regulate the human memory, it does not seem singular that several persons, in speaking of a past transaction, do not each re-produce it, in description, with the same fullness of detail; but such is not the vulgar notion. Among the ignorant, the strongest proof of the truth of testimony derived from several witnesses, is the fact that the statements of each is nearly identical with those of the others. Hence, the exact similarity which we so often see in the depositions of corrupt witnesses, whose evidence has been pre-arranged. But in the testimony of these two persons now before me, there are none of the usual marks of collusion. No two narratives concerning the same transaction, could be more unlike. It certainly has every appearance of being descriptions of the same occurrence, observed from different stand-points. Thus, the woman states nothing, scarcely, beyond her being admitted into the hotel, and going twice to the defendant's room; on the other hand, the second witness supplements this statement with a full recital of the risks and difficulties which beset his part of the undertaking, and the means used by him to counteract or avoid them. In my judgment, nothing could be more natural than this testimony; it certainly has every appearance of being the truth. Considered in all its aspects, it has left my mind impressed with the conviction that it is entitled to very great weight. But I should not feel willing, no matter how great the plausibility of this testimony, to rest a judgment upon it, unless

supported by other witnesses. The next step, therefore, will be to ascertain how far, if to any extent, this direct evidence has been corroborated.

The first circumstance having this tendency, is the proof of the defendant's manifest disposition and constant proclivity to the commission of the offence with which he is charged. It has been clearly proved that he was not under any moral restraints whatever with regard to this part of his conduct. Several witnesses speak to the point. Thus, Daniel Benjamin, a waiter in the Delavan House, has deposed to a conversation, in which the defendant made inquiries about a female boarding in the hotel, and told the witness if she was of a loose character, to induce her to come to his room. He further testifies, that at another time the defendant sent him to procure for him a woman of vicious habits, and bring her to his chamber, and that he endeavored to do so, but did not succeed; and that, on a subsequent occasion, at the defendant's request, he took him to an house of ill-fame, where he left him. So, Robert McIntyre, another witness, mentions a conversation of a similar strain, which he held with defendant, and so well does his character in this respect appear to have been understood, that another witness tells us, that he was known among the female servants of the house by the appellation of "the gay colonel." It seems to me that it cannot be denied that this proof of the depraved mind and loose habits of the defendant are strong supports of the direct evidence, for it certainly becomes nowise incredible that he is guilty of the crime which it plainly appears he sought every opportunity to commit.

Next in order in the train of corroborative circumstances, may be properly placed the facts deposed to by the three witnesses, Edward Lee, Daniel A. Hall, and Francis Oatfield. This testimony is very material, for it goes close to the point of the controversy. Edward Lee says, he was walking with Louisa Butts at the time she was accosted in the street by the defendant, and he corroborates her statement touching all the particulars of that meeting. Hall and

Adams *v.* Adams.

Oatfield testify to the fact of seeing this woman, with the connivance of Levi Johnson, obtain access into the Delavan House, through the private entrance, about the time referred to by her. After a scrupulous consideration of this part of the evidence, I am unable to perceive any proper ground on which it can be rejected as unworthy of belief. It is true that neither of the witnesses belong to a class on which a court can implicitly depend. Lee appears to have been a man of a low order and of dissolute habits, and in some irrelevant points his evidence has been contradicted. The other two witnesses are colored men; the one, by occupation a waiter, the other a barber. But there is no reason to suppose either of them was under any influence which would incline to testify, in this case, falsely. They delivered their testimony, so far as the record exhibits, with propriety, and their statements are not marked either by inconsistencies or exaggeration. The characters of two of them are in no respect impugned. And, finally, they depose to facts which are in nowise improbable; for, as we have just seen, from the habits of the defendant, what these witnesses say they saw was not unlikely to occur. The strictures of counsel on this branch of the evidence have not been forgotten; but I think it would tend to no useful purpose to refer to such criticism, except to say that it has received due consideration, yet that it has not shaken my confidence in the testimony. My conclusion is, on the whole case presented by the petitioner, that it must be regarded as sustained by satisfactory proofs, unless such proofs are to be considered as overcome by the evidence on the part of the defence.

This forms the last head of inquiry.

The case of the defendant rests, as I conceive, on a single point, which is, that he did not, at the time referred to by the two principal witnesses of the petitioner, Levi Johnson and Louisa Butts, occupy room number 150, in the Delavan House. The time laid by each of these witnesses, it will be remembered, was the twenty-fifth of March, 1864. They

are both positive upon this point. The female attempts to fortify her position, in this particular, by a reference to a circumstance which, however, is shown by the defendant not to have occurred on that day. The confirmatory witnesses, Hall and Oatfield, stand very nearly on the same point of time. Under these circumstances, the defendant produced witnesses who have established, beyond all reasonable doubt, that on this day, thus laid and adhered to with much pertinacity, he did not occupy the room in question. The elucidations of this subject by William B. Field and David McClosky, the one a clerk, and the other a book-keeper at the Delavan House, place this matter beyond a cavil.

It is clear that the defendant arrived at this hotel on the 22d of March; that he staid on that visit beyond the 25th; and that during that visit he occupied rooms, numbers 38 and 37, and none other. The defence virtually is an *alibi*, and it is insisted that it meets the whole case, as it extends over the 25th of March, the time attempted to be proved. But I cannot at all agree to this view. Instead of esteeming the matter thus set up an adequate defence, I feel constrained, from various considerations, to regard it as a mere subterfuge. The artifice, I think, is conspicuous on the very face of the facts. It is in proof, that the defendant was at this hotel several times near to the visit to which allusion has just been made. The witness, Levi Johnson, when questioned upon the subject, said that the way he fixed the time of the act of adultery to which he deposes, was by a reference he had made to the books of the house, and that he had thus ascertained when it was that the defendant was put into room, number 150. With regard to the time of the occurrence to which he deposes, he thus expressly says he took the book as his guide. In other words, then, his evidence amounts to this, that if the books could be relied on, the act of adultery was committed on the 25th of March. Now the defendant himself shows, by the testimony of the clerk, Mr. Field, that when the defendant arrived at the Delavan House, on the 22d of March, this room, number 150, was, in

point of fact, assigned to him upon the books; but this witness further states, that on account of certain considerations, which he specifies, the defendant did not on that visit in reality occupy this room. This evidence, as I think, amounts to this: it shows that the defendant did not on the 25th of March occupy room, number 150, and that the alleged act of adultery was not at that time committed in it. But it goes no further than this, for if the defendant, at a previous visit, just before the time laid by the witnesses of the petitioner, had possession of the room in question, then manifestly the testimony introduced by him on this point, can be of no avail whatever. For when the defendant formally proved the fact by two witnesses, that on the 25th of March he did not occupy the room, number 150, he was perfectly aware that the hotel book had misled the witness of the petitioner as to the time of the occupancy of this chamber, and upon this misconception, he has constructed the whole fabric of his defence. It was impossible for him not to understand that the substance of the case made against him was, whether or not, at or about the time specified, he had committed adultery in room, number 150; and possessed of this knowledge, he contents himself by showing that subsequent to the 22d of March he could not have been guilty, because he occupied another chamber. He was aware that the precise time was not important; that Levi Johnson had been misled by the books as to the precise time, and yet his whole answer to the case made, is confined to this mere point of time. If the fact be so, he could have had no difficulty in showing that he did not inhabit this room at any time towards the close of February, or in the beginning of March, of that year; and such proof would have been, as he must have well known, a conclusive defence to the charge against him. The witnesses called by him had the books of the hotel under their control. They were, therefore, able to state whether, during the period specified, he had been an inmate of this chamber. And it is also a significant fact that both these witnesses were examined under a commission, and that by the frame of

the interrogatories, they were rigidly confined on the subject, to the period of the visit commencing on the 22d of March. They are both asked to describe the location of room, number 150, but they are not asked if the defendant occupied it. The omission is full of meaning. I can scarcely think it was the result of an oversight. At all events, it leaves the defence entirely inadequate; it is an answer to the letter, but not to the substance of the case proved by the petitioner.

If the case had closed at this point, I should have held the defence a failure; but there is other evidence before me, showing that the defendant did occupy, near the time in question, this room, number 150.

The testimony of Richard J. Page appears to me to put this matter at rest. This witness was a book-keeper in the Delavan House, and he has deposed to the effect that the defendant was at that hotel about the latter part of the month of February, or the beginning of March, 1864, and that a part of the time during this visit, he had a room on the inside of the hall, being a number between 145 and 154. The witness shows that he is well founded in his opinion, by a reference to occurrences, so as to preclude all probability of mistake. In addition to this very weighty evidence, the deposition of James Burrowes, has been also introduced, in which he testifies to a conversation, in which the defendant admitted that the woman, Louisa Butts, had been to his room, but alleged that she came to see him with regard to one of her relations, who had been connected with the army. The conversation thus deposed to, took place prior to the taking of any testimony in the cause, and at that time it would seem that there was no intention to rest the defence on a denial that the woman, Louisa, did visit the room of the defendant; but this line of defence became obviously impracticable under the developments of the petitioner's case, and hence the adoption of another theory. But the fact of the admission of the defendant, of the presence of this woman in his room, remains uncontradicted and unexplained. In view of the evidence on both sides, I think the defendant has suc-

ceeded in proving that the act of adultery which he perpetrated in room, number 150, in the Delavan House, was not committed on the 25th of March. This proof cannot in the least shake the case of the petitioner.

But there is still another consideration which bears upon this point, and indeed gives a complexion to the entire defence. This is the fact that the defendant has not been examined as a witness in his own behalf. The case made by the petitioner was one which appeared to render it not only proper, but, as I think, absolutely necessary for the party charged to attest his own innocence. It was the only direct evidence in the way of negation, in his power. However sanguine his temperament, he could not fail to perceive the gravity of the case against him. On his own side, he had attempted to impair the confidence of the court in the evidence of his adversary ; but his own oath would tend to the entire vindication of his character. In his position, I cannot but think that his own oath became an indispensable part of any defence which he could interpose, and I should regard its absence, under any circumstances, as a most suspicious incident. But the conduct of the defendant in this respect is open to still graver observation; for he has not only withheld his oath from the case, but he offered himself as a witness, in a manner which has left no doubt in my mind, that such offer was not made in good faith. I have endeavored to give the circumstances a more favorable aspect, but, after full consideration, I am unable to see how, except by closing my eyes in wilful blindness, I can regard the defendant's conduct in this regard, in any other light than that above indicated.

The offer referred to was made in this wise. On the 27th of November, 1865, the defendant was, in person, before a master of this court, in Jersey City, who for several days previous, had been occupied in taking the evidence offered by him. At the hour of eleven o'clock at night, on the day designated, the defendant, in the language of the memoran-

dum of the master, "proposed to be sworn in the cause, as he is compelled to be in Albany the balance of this week, which is the residue of the time allowed him for taking testimony, and that he cannot appear before the master in New Jersey again, before his time expires under the order of the court." The counsel of the petitioner expressed his willingness to go on, but the master, as a matter of course, refused. Now, will any person believe that this offer was made *bona fide?* What was the business of such importance which compelled the defendant to absent himself? The case is silent upon the subject. Why had he not been examined before? He had just been engaged for hours, if not days, in taking depositions to show the hostility of his mother-in-law to him, and it surely is unreasonable to suppose that he thought these as important to his defence as his own sworn denial of guilt, and the elucidation which he alone could give of the entire case. Besides, a few days after this, the record discloses the fact that he is almost uselessly present by the side of his counsel, while witnesses are being examined on written interrogatories annexed to a commission. This entire transaction has left not a particle of doubt in my mind, that this proffer by the defendant of himself as a witness in the cause, was not made in sincerity, but with a perfect assurance that his examination was impracticable. It is scarcely necessary for me to remark how much an artifice of this kind should weigh against its contriver. In my opinion it falls little short of an acknowledgment that the defendant could not deny, under his oath, the offence imputed to him.

Upon the whole case, my conclusion is, that the case of the petitioner is fully made out by the proofs adduced, and that her prayer should be granted. I shall advise his honor, the Chancellor, in accordance with this view.